# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GIANT EAGLE, INC., a Pennsylvania Corporation, | ) ) ) Civil Action No. _____ |
| Plaintiff, | ) ) COMPLAINT |
| v. | ) ) |
| THE HERSHEY COMPANY, HERSHEY CANADA INC., MARS CANADA INC., MARS, INCORPORATED, MARS NORTH AMERICA, MARS SNACKFOODS U.S. LLC, NESTLÉ CANADA INC., NESTLÉ S.A., NESTLÉ USA, Inc., CADBURY ADAMS CANADA, INC., CADBURY SCHWEPPES PLC, and ITWAL, LTD. | ) ) ) ) ) ) ) ) ) ) ) JURY TRIAL DEMANDED. |
| Defendants. | ) ) |

## COMPLAINT

Plaintiff, Giant Eagle, Inc. ("Giant Eagle"), brings this action for treble damages and permanent injunctive relief under the antitrust laws of the United States and the Ohio Valentine Act against Defendants The Hershey Company, Hershey Canada Inc., Mars Canada Inc., Mars, Incorporated, Nestlé Canada Inc., Nestlé S.A., Nestlé USA, Inc., Cadbury Adams Canada, Inc., Cadbury Schweppes plc, and ITWAL Ltd. (collectively, "Defendants"), and demands a trial by jury.

## NATURE OF THE ACTION

1.      This action arises out of an international conspiracy among the world's leading manufacturers of chocolate confectionery products to fix, raise, maintain or stabilize prices for those products in Canada and the United States.  Significantly, this action follows the initiation and announcement of governmental investigations by Canadian competition authorities into

alleged price-fixing of chocolate confectionery products in these jurisdictions. Some of the Defendants, including Mars and Nestlé, have also confirmed in news reports that they have received inquiries from the United States Department of Justice into alleged price fixing. European authorities, including Germany's Federal Cartel Office, are also investigating the Defendants for suspected price fixing. In addition, many other civil antitrust actions have been filed throughout the United States against the Defendants, and there are presently proceedings before the Judicial Panel on Multidistrict Litigation, at MDL No. 1935, to determine whether several of the pending actions should be consolidated and transferred for pretrial proceedings to one of several districts where related actions are pending.

2.      As alleged more fully below, Giant Eagle alleges a conspiracy among Defendants and certain unnamed co-conspirators to fix, raise, maintain or stabilize prices for chocolate confectionery products (as defined in this Complaint) sold in or sold for delivery in the United States and its territories beginning in 2002 and continuing until at least approximately 2008.

3.      Giant Eagle was and is a direct purchaser from Defendants from January 1, 2002 through the present (the "Relevant Period") of chocolate confectionery products (as defined herein) produced by Defendants or subsidiaries thereof in either the United States or Canada where such purchase was either in the United States and its territories or for delivery in the United States and its territories.

4.      At all relevant times, Defendants manufactured and sold chocolate confectionery products. During the Relevant Period, Defendants and their co-conspirators agreed, combined, and conspired with each other to fix, raise, maintain or stabilize prices for chocolate confectionery products sold in, or sold for delivery in, the United States, in violation of Section 1

of the Sherman Act (15 U.S.C. § 1) and the Ohio Valentine Act, Ohio Rev. Code §§ 1331.01, 1331.02, 1331.04, and 1331.08.

5.      As a result of Defendants' unlawful conduct, Giant Eagle paid artificially inflated prices for these products, and therefore has suffered injury to its business and property.  Giant Eagle seeks damages and injunctive relief.

## JURISDICTION AND VENUE

6.      This civil action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) for treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)) and for permanent injunctive relief pursuant to § 16 of the Clayton Act (15 U.S.C. § 26).  Giant Eagle also asserts a pendant state law claim pursuant to the Ohio Valentine Act, Ohio Rev. Code § 1331.01 *et seq.*

7.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

8.      Venue is proper in this Judicial District pursuant to 15 U.S.C.§§ 15 and 22, and 28 U.S.C § 1391(b) and (c) because, during the Relevant Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

9.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of chocolate confectionery throughout the United States, including this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## **DEFINITIONS**

10.     Chocolate comprises a number of raw and processed foods that are produced from the seed of the tropical cacao tree.  The seeds of the cacao tree have an intense bitter taste, and must be fermented to develop their flavor.  After being roasted and ground, the resulting products are known as cocoa or chocolate.  Chocolate is any product made primarily of cocoa solids and cocoa fat.  The different flavors of chocolate can be obtained by varying the time and temperature when roasting the beans, by adjusting the relative quantities of the cocoa solids and cocoa fat, and by adding non-chocolate ingredients.

11.     The term "chocolate confectionery products", as used in this Complaint, refers to chocolate bars, boxed chocolates, and seasonal novelty chocolates.

12.     Chocolate bars are divided into block and countline segments.  The block segment is comprised of molded blocks of chocolate that can be prepared as is or with additional ingredients, and are traditionally sold in standard weight and sizes.  Products in this segment include Hershey's Chocolate Bar and Cadbury's Dairy Milk bar.  The countline segment consists of chocolate-covered products sold by count rather than weight.  Examples of products in this segment include Mars' Snickers bar and M&M's and Nestlé's Kit Kat bar.

13.     Boxed chocolates are assorted chocolates sold together in a box or similar container, and are mainly sold as gifts. Examples of products in this segment include Cadbury's Milk Tray and Hershey's Pot of Gold.

14.     Seasonal novelty chocolates are chocolates that tend to be sold near, and marketed for, particular holidays, such as Christmas, Easter, Valentine's Day, and Halloween.

## PLAINTIFF

15.      Plaintiff, Giant Eagle, Inc., is a Pennsylvania corporation with its principal place of business located at 101 Kappa Drive, Pittsburgh, Pennsylvania.  Giant Eagle, through its divisions and/or wholly owned subsidiaries, including OK Grocery Company, HBC Service Company, and American Seaway Foods, purchased chocolate confectionery products in the United States or for delivery in the United States, including in Ohio, directly from one or more of the Defendants during the illegal antitrust conspiracy described below.

## DEFENDANTS

### The Hershey Defendants

16.      Defendant Hershey Canada Inc. ("Hershey Canada") is a Canadian corporation with its principal place of business at Airport Corporate Centre, 5750 Explorer Drive, Suite 500, Mississauga, Ontario.  Hershey Canada is a wholly-owned subsidiary of The Hershey Company that manufactures, distributes, and sells confectionery, snack, refreshment and grocery products in Canada.  During the Relevant Period, Hershey Canada manufactured and sold chocolate confectionery products to purchasers in Canada and the United States, directly or through its predecessors, affiliates and/or subsidiaries.

17.      Defendant The Hershey Company is a Delaware corporation with its principal place of business at 100 Crystal A Drive, Hershey, Pennsylvania. The Hershey Company is the leading North American manufacturer of chocolate and non-chocolate confectionery and grocery products.  During the Relevant Period, The Hershey Company manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

18.      Defendants Hershey Canada and The Hershey Company collectively are referenced as "Hershey" in the Complaint.  Hershey manufactures a variety of chocolate

5

confectionery products under the Hershey's, Hershey's Kisses and Reese's brand names. In addition, it manufactures and distributes in the United States certain chocolate confectionery products under license, such as the products mentioned above under a license from Cadbury and the Kit Kat bar under a license from defendant Nestlé S.A. Hershey also manufactures and distributes various other chocolate confectionery products, such as the 5th Avenue bar, the Krackel bar, Milk Duds, the Special Dark bar and the Harmony Bar.

## The Mars Defendants

19.     Defendant Mars Canada Inc. ("Mars Canada") is a Canadian corporation with its principal place of business at 37 Holland Drive, Bolton, Ontario. Mars Canada is the Canadian division of Mars, Incorporated. Before May 8, 2007, Mars Canada was known as Effem Inc. During the Relevant Period, Mars Canada manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

20.     Defendant Mars, Incorporated is a Delaware corporation with its principal place of business at 6885 Elm Street, McLean, Virginia. From its origins in candy and confectionery products, it has diversified to become a world leader in several other markets, including snack foods, pet care products, and drinks. During the Relevant Period, Mars manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

21.     Defendant Mars North America is headquartered at 800 High Street, Hackettstown, New Jersey. It is the United States food, snack, and petcare operations of defendant Mars, Incorporated. During the Relevant Period, Mars North America manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

6

22.     Defendant Mars Snackfood U.S. LLC is headquartered at 800 High Street, Hackettstown, New Jersey.  It is a business unit of defendant Mars, Inc. and is responsible for the manufacture and sale of chocolate and non-chocolate confectionery products across various facilities located throughout the United States, directly or through its predecessors, affiliates and/or subsidiaries.

23.     Defendants Mars Canada, Mars, Incorporated, Mars North America, and Mars Snackfood U.S. collectively are referenced as "Mars" in the Complaint.  Mars manufactures and distributes various chocolate confectionery products such as the 3 Musketeers, Mars, Snickers, Twix, Dove and Milky Way bars.

**The Nestlé Defendants**

24.     Defendant Nestlé Canada Inc. ("Nestlé Canada") is a Canadian corporation with its principal place of business at 25 Sheppard Avenue West, Floors 18-22, North York, Ontario. Nestlé Canada is a wholly-owned subsidiary of Switzerland's Nestlé S.A. Nestlé Canada is grouped into various divisions, including chocolate and confectionery, coffee and beverages, food services, ice cream, nutrition, water, and pet care. During the Relevant Period, Nestlé Canada manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

25.     Defendant Nestlé S.A. is a Swiss company with its principal place of business at Avenue Nestlé 5, CH-1800, Vevey, Vaud, Switzerland.  It is the world's largest food and beverage company.  Nestlé S.A. participates in numerous markets, including coffee, water, other beverages, ice cream, infant nutrition, health food, pet food, soups, seasonings, pasta sauces, frozen food, refrigerated products, confectionery, and biscuits.  During the Relevant Period, Nestlé S.A. manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

7

26.     Defendant Nestlé USA, Inc. ("Nestlé USA") is a Delaware corporation with its principal place of business at 800 North Brand Boulevard, Glendale, California.  Nestlé USA is a wholly-owned subsidiary of Nestlé S.A.  Nestlé USA is grouped into various divisions, including chocolate and confectionery, coffee and beverages, food services, ice cream, nutrition, water, and pet care.  During the Relevant Period, Nestlé USA manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

27.     Defendants Nestlé Canada, Nestlé S.A., and Nestlé USA collectively are referenced as "Nestlé" in the Complaint.

### The Cadbury Defendants

28.     Defendant Cadbury Adams Canada, Inc. ("Cadbury Adams Canada") is a Canadian corporation with its principal place of business at 5000 Yonge Street, Suite 2100, Toronto, Ontario. Cadbury Adams Canada is a subsidiary of defendant Cadbury Schweppes plc. Cadbury Adams Canada manufactures and sells a wide array of confectionery products.  During the Relevant Period, Cadbury Adams Canada manufactured and sold chocolate confectionery products to purchasers in the United States and Canada, directly or through its predecessors, affiliates and/or subsidiaries.

29.     Defendant Cadbury Schweppes plc ("Cadbury Schweppes") is an English company, with its principal executive offices at 25 Berkeley Square, London, England.  Cadbury Schweppes' principal businesses are confectionery and non-alcoholic beverages, and it has the largest share of the global confectionery market, with broad participation across all categories and by geography.  Cadbury has confectionery operations in the U.S. and Canada.  Its U.S. operations are conducted through Cadbury Adams USA LLC ("Cadbury Adams USA"), which has its principal place of business at 389 Interpace Parkway, Suite 1, Parsippany, New Jersey.

8

During the Relevant Period, Cadbury Schweppes licensed The Hershey Company to manufacture and distribute York Peppermint Patties, Peter Paul Mounds, and Peter Paul Almond Joy worldwide and Cadbury and Caramello branded products in the United States. Cadbury Schweppes manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

30.     Defendants Cadbury Adams Canada and Cadbury Schweppes collectively are referred to as "Cadbury" in the Complaint.

### Defendant ITWAL

31.     Defendant ITWAL Ltd. is a national network of independent, diversified retail and foodservice wholesale distributors based in Canada. It is headquartered at 440 Railside Drive, Brampton, Ontario. During the Relevant Period, ITWAL was aware of, coordinated, and facilitated the unlawful conspiracy alleged herein.

### CO-CONSPIRATORS

32.     Various other persons, firms and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Each defendant acted as the agent or joint venturer of or for other defendants with respect to the acts, violations and common course of conduct alleged by Giant Eagle.

33.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## TRADE AND INTERSTATE COMMERCE

34.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

35.     During the Relevant Period, Defendants and their co-conspirators, manufactured, sold and shipped substantial quantities of chocolate confectionery products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants produced these products.

36.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## FACTUAL ALLEGATIONS

### The Chocolate Confectionery Product Market

37.     Chocolate confectionery products constitute a distinct product market recognized by Defendants, the trade associations that serve the confectionery industry and other bodies that have examined the industry.  According to statistics reported by the United States Department of Agriculture, wholesale sales of chocolate candy in the U.S. total approximately $10.2 billion, while retail sales totaled $15.6 billion.  A June 2007 report from Matrade New York reported that U.S. chocolate candy sales in 2006 totaled approximately 56% of all candy sales.

38.     Important characteristics of the chocolate confectionery products market facilitate anticompetitive collusion among the Defendants.

39.     Chocolate confectionery products are undifferentiated commodity products. Thus, any Defendant can and does produce and sell, for example, a certain type of chocolate candy bar, seasonal novelty chocolate, or boxed chocolate that is fungible with a chocolate candy bar, seasonal novelty chocolate, or boxed chocolate offered by another Defendant, respectively.

10

40. The market for chocolate confectionery products is highly concentrated. Defendants collectively control almost 50% of the global chocolate confectionery products market, with Hershey controlling 8.2%, Nestlé 12.6%, Cadbury 7.5%, and Mars 14.8%. Defendants The Hershey Company, Mars, Incorporated, and Nestlé USA collectively possess approximately 80% of the U.S. chocolate confectionery products market, with The Hershey Company possessing about 45%, Mars, Incorporated about 27%, and Nestlé about 9%. And Defendants Hershey Canada, Mars Canada, Nestlé Canada and Cadbury Adams Canada Inc. collectively possess about 64% of the Canadian chocolate confectionery products market.

41. In addition, there are high barriers to entry to the chocolate confectionery products market in the form of technical know-how, advertising, and access to distribution channels. The manufacture of confectionery products is highly technical, requiring considerable understanding of food technology, including hardware (processing machinery and computers), software and formulation technology. Technical know-how is required to integrate these elements in an effective production system that is efficient and results in a high-quality, innovative product. Moreover, there is significant spending on advertising. In addition, access to supply channels is critical to gain a foothold, as wholesale distributors, chain grocery stores, mass merchandisers, chain drug stores, vending companies, wholesale clubs, convenience stores, dollar stores, concessionaires, and department stores form the most significant distribution channel for confectionery sales. Because of their high collective market share globally as well as in the U.S. and Canada, Defendants collectively are able to exercise market power in each of these markets, including the ability to raise prices and erect barriers to entry.

42. Pricing for chocolate confectionery products in Canada and the U.S. during the Relevant Period was characterized by industry-wide price increases. Moreover, during the

Relevant Period, price increases in the same or similar amounts for chocolate confectionery products were announced by multiple Defendants and/or became effective at or near the same time.

43.     The U.S. is the leading exporter of chocolate confectionery products to Canada as well as the leading importer of chocolate confectionery products from Canada.  A 2004 United States Department of Agriculture report noted that in 2003, 46% of U.S. confectionery exports were to Canada. A 2005 United States Department of Agriculture report noted that "the United States supplied 45% of Canadian chocolate candy imports by value."  The 2007 Matrade New York report cited above indicated that in 2004-06, Canada was the largest exporter of chocolate food products to the U.S., with annual total customs values ranging from $690 to $705 million.

## Violations Alleged

44.     The chocolate confectionery product market was ripe for collusion. In addition to the collective market power exercised by the Defendants, as detailed above, Defendants' profits from these products have suffered in recent years because of increasing health concerns, and changing consumer preferences, with respect to chocolate consumption.

45.     The Canadian and U.S. operations of the Defendants are tightly interwoven. Thus, for example, sales of Hershey's chocolate confectionery products in the U.S. and Canada are overseen by its North American Commercial Group.  Likewise, Cadbury's confectionery sales in the U.S. and Canada are overseen by its Americas Confectionery operating unit.  Nestlé has its own Chocolate, Confectionery & Biscuits Strategic Business Unit.

46.     In the face of waning demand, Defendants responded by instituting uniform parallel price increases during the Relevant Period in Canada and the U.S.  In Canada, for example, on July 19, 2005, Nestlé Canada announced a chocolate confectionery product price

increase for 5-8%, effective October 31, 2005 for base confectionery and April 18, 2006 for seasonal confectionery. Cadbury Adams Canada announced a price increase on average of 5.2% on its chocolate portfolio soon thereafter, effective October 31, 2005. In addition, Hershey announced a price increase on most chocolate confectionery products, also effective October 31, 2005. Mars announced a price increase on average of 6% on select items in its chocolate confectionery portfolio, effective November 7, 2005.

47.　Likewise, in the U.S. market, for example:

 a.　On December 9, 2002, Mars, Incorporated (via its Masterfoods USA division) increased wholesale prices on single packs of chocolate bars by approximately 10 percent. A few days later, The Hershey Company (then known as Hershey Foods Corp.) announced a price increase (which was implemented on January 1, 2003) for the wholesale price of its domestic standard size, king size, variety pack, 6-pack and 10-pack candy bar lines. The increase raised the price of standard-size candy bars in particular 10.8%. Hershey spokeswoman Christine Dugan said Hershey raised prices after rival Mars recently raised its prices. Hershey's move represented a break with the past; it had not raised prices on standard-sized candy bars since 1996.

 b.　In December of 2004, The Hershey Company increased the wholesale prices of approximately half of its domestic confectionery line. Changes that were effective in January 2005 represented a weighted-average increase of approximately six percent on its standard bar, king-size bar, 6-pack, and vending lines. Changes that were effective in February of 2005 represented a weighted-average price increase of four percent on packaged candy. The price increases announced in December of 2004 represented an average increase of three percent over the entire domestic product line. Hershey's standard candy bars, king-size bars, six-packs and vending candies were to increase by an average of 5.8%, whereas packaged chocolates were to increase by an average of 4.1%. Significantly, Hershey's increase came weeks after Mars, Incorporated (via its Masterfoods USA division) raised its prices for its corresponding chocolate confectionery products by similar amounts.

 c.　On March 21, 2007, The Hershey Company announced wholesale price increases of its domestic confectionery by about 4-5%, citing the need to help offset costs. Mars Inc. (via its Masterfoods USA division), raised prices only a couple of days later, effective March 23, 2007, for the wholesale prices of its chocolate confectionery products by an average of 5 percent purportedly due to rising costs, particularly cocoa. Mars'

increase raised prices for confectionery single and king-size chocolate bars of well-known brands including M&Ms, Snickers, Twix, Milky Way and Dove. Mars and Hershey both publicly noted that their previous price increases were more than two years ago. Nestlé also raised prices for its chocolate confectionery products in April 2007 by an average of 5 percent, purportedly due to rising commodity, packaging and energy costs. Cadbury also raised prices for its chocolate confectionary products around the same time and in similar amounts.

48. Defendants falsely asserted that these price changes were fully justified by increases in component costs. The price increases were instead the product of a conspiracy among Defendants , and cannot be explained solely by purported changes in the price of raw materials for these products.

49. Giant Eagle made over $200 million in chocolate confectionary purchases from Defendants and others during the Relevant Period, including large purchases from Hershey, Mars, and Nestlé, as follows:

| Year | Hershey[1] | Mars | Nestlé |
|---|---|---|---|
| 2002 | $14,087,634 | $6,085,335 | $4,799,216 |
| 2003 | $15,737,637 | $6,532,698 | $4,816,224 |
| 2004 | $18,471,505 | $6,861,379 | $5,001,605 |
| 2005 | $20,553,752 | $7,466,693 | $5,854,578 |
| 2006 | $22,509,893 | $7,551,257 | $6,902,874 |
| 2007 | $21,476,216 | $8,051,318 | $7,432,081 |
| **Total By Vendor** | $112,836,637 | $42,548,680 | $34,797,578 |

---

[1] Hershey's purchases includes Cadbury chocolate purchases as Hershey has exclusive production and distribution rights to the Cadbury products which are sold in the United States and which Giant Eagle purchased during the Relevant Period.

50.     Defendants Hershey, Mars, and Nestlé increased their prices to Giant Eagle during the Relevant Period.  For example, on December 23, 2004, Hershey increased its prices to Giant Eagle by 16.7%; a few weeks later, on January 12, 2005, Nestlé increased its prices to Giant Eagle by 17.04%.  Less than two months later, on March 6, 2005, Mars increased its prices by 15.6%.  In March and April of 2007, Mars, Hershey, and Nestlé each increased their prices by 5.4% (Mars - March 27, 2007), 5.4% (Hershey – April 5, 2007), and 6.18% (Nestlé – April 13, 2007).  In 2008, Mars led with a price increase of 5.12% on January 25, 2008, and Hershey followed on January 30, 2008 with a 12.4% price increase.  Nestlé likewise increased its prices to Giant Eagle by 11.30% on February 7, 2008.

51.     From at least January 1, 2002 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of chocolate confectionery products in the United States or for delivery in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

52.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for chocolate confectionery products in the United States or for delivery in the United States.

53.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

      a.    participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain or stabilize prices of chocolate confectionery products in the United States;

      b.    issuing price announcements consistent with, and selling chocolate confectionery products at, the agreed upon prices; and

    c.    participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

54.    The Canadian Competition Bureau ("Bureau") currently is investigating Defendants for alleged price-fixing of chocolate confectionery products and recently received permission to search their Canadian offices. The Bureau submitted two sets of Information on November 19 and November 28, 2007, in support of its request to obtain search warrants. On November 21, 2007, Ontario's Superior Court of Justice granted the November 19, 2007 search warrant.

55.    The search warrants were based in part on information obtained from a "Cooperating Party," which according to news reports is believed to be Cadbury. Cadbury is likely to be the party cooperating with Canadian authorities based on the fact that Cadbury is not named in the warrants as one of the companies under investigation, despite its large Canadian market share.

56.    The November 19, 2007 Information details several meetings and communications beginning at least as early as February 2004, including meetings at coffee shops, restaurants, conventions, and the offices of Nestlé, amongst Hershey, Mars, Nestlé, and the "Cooperating Party."   In the November 19, 2007 Information, the Competition Bureau set forth the following:

    a.    "Cooperating Individual 1" participated in a breakfast meeting with the President and CEO of Nestlé Canada Inc., Bob Leonidas, on February 23, 2004, at which time the parties discussed the topic of "trade spend" (the industry practice of providing discounts, rebates and allowances to customers, often linked to promotions). According to the Information, "Cooperating Individual 1 indicated that it was known in the industry that he disagreed with the industry's prevailing approach to trade spend and that the Cooperating Party was going to reduce trade spend on chocolate. Cooperating Individual 1 indicated that he left the meeting with the impression that Leonidas 'sees the world the way' that he did. Cooperating Individual 1 also understood that he had an open line to call

Leonidas if there were any issues in the market, including trade spend practices."

b.    An internal email exchange provided by the "Cooperating Party" with a starting date of June 1, 2005 relates to a discussion with their customer, Defendant ITWAL Limited, a distributor, concerning chocolate pricing. "Cooperating Individual 11 sent an email with the subject heading 'Chocolate pricing' to Cooperating Individual 12 and Cooperating Individual 13 stating: 'At ITWAL I was informed by a reliable source that both Nestlé and Effem have been to customers hinting at 2005 price increases. No details or confirmation. I suggested that we would seriously consider appropriate actions once firm details known, and that I would be concerned about the other leading player not following which my contact said they would inquire about. This is similar to info we had picked up a couple of months ago. Martin I would send out a note to ADM's to start digging.'"

c.    "Cooperating Individual 1" met Leonidas of Nestlé at Manoir Richelieu during a Confectionary Manufacturers Association of Canada annual meeting held from June 2-5, 2005.  According to the Information, "Cooperating Individual 1 stated that Leonidas said words to him to the effect of 'I want you to hear it from the top – I take my pricing seriously' or 'We are going to take a price increase and I want you to hear it from the top.'  Leonidas handed Cooperating Individual 1 an envelope. Cooperating Individual 1 accepted the envelope without objection. Cooperating Individual 1 said 'I may have said 'we like to take pricing too, we take it seriously.' I don't think [Leonidas] took a negative impression. I just don't know if he thought it was favorable.'  Cooperating Individual 1 agreed that Leonidas would have left the meeting with the idea that the Cooperating Party would follow a price increase led by Nestlé."

d.    "Cooperating Individual 1" advised the Bureau that the envelope contained information concerning Nestlé's planned price increases for chocolate in 2005.  He understood that there was a problem with him receiving this information, and advised the Bureau that "you shouldn't talk about pricing.  I didn't want to be rude to [Leonidas] so I said OK, was neutral, but I didn't want him to think, in any way, that I was coordinating with him."  Cooperating Individual 1 also stated that the letter was similar to another Nestlé price increase letter he had received.

e.    An email exchange provided by the Cooperating Party dated July 6, 2005 indicates that by at least that date a letter containing confidential Nestlé price increase information was circulating around the Cooperating Party's office.  One of the emails observed that the letter was a draft, as it was dated July 15, 2005, was unsigned, and contained spelling mistakes. The information was that Nestlé was increasing the price of its confectionery portfolio by approximately 5 to 7%, effective October 31, 2005 for base

confectionery and April 18, 2006 for seasonal confectionery. This pricing information was discussed among the Cooperating Party's leadership team and prompted the Cooperating Party to consider and announce a price increase on chocolate. The Cooperating Party has also provided the Bureau with a copy of a letter located in its files that appears to be the July 15 letter.

f.    Cooperating Individual 2 stated that Cooperating Individual 1 called her on July 6, 2005 from Europe and instructed her to go to the Nestlé [Canada Inc.] offices to pick up something from Leonidas. Cooperating Individual 2 got Leonidas' phone number from Cooperating Individual 1's contacts and called Leonidas to arrange a time. Cooperating Individual 2 went to the Nestlé [Canada Inc.] offices with a colleague and was met by Leonidas downstairs. He said something to the effect that it was better not to be seen in his office and handed Cooperating Individual 2 an envelope. Cooperating Individual 2 subsequently opened the envelope and it contained information about a planned price increase by Nestlé [Canada Inc.] Counsel for the Cooperating Party provided the Bureau with a copy of the document that Cooperating Individual 2 had retrieved from the files and Cooperating Individual 2 believes it is the document that was contained in the envelope from Leonidas. The document is an unsigned letter on Nestlé letterhead announcing a chocolate price increase to the trade and was forward dated July 19, 2005. The July 19 letter is substantively the same as the July 15 letter, except that spelling mistakes had been corrected and the percentage price increase had been increased to "5 to 8%."

g.    Cooperating Individual 2 said that when she returned to the office on July 6, 2005, she called Cooperating Individual 1 in Europe, as he had requested, and left a voice-mail reading the contents of the letter. Cooperating Individual 2 also states that she sent an email message to Cooperating Individual 1 informing him that she had left him a voice-mail regarding the Nestlé letter. The Cooperating Party has provided the Bureau with a copy of an email from Cooperating Individual 2 to Cooperating Individual 1 dated July 6, 2005 that states "Sent voice-mail re Nestlé letter."

h.    Regarding the email from Cooperating Individual 2 dated July 6, 2007, Cooperating Party 1 explained that earlier that day he had received a confirmation on voice-mail that Nestlé [Canada Inc.] was going to have a price increase. Cooperating Individual 1 thinks he sent a voice-mail or email message to Cooperating Individual 2 and asked her to forward the message by voice-mail to others in the Cooperating Party along the lines of "If Nestlé is going to take a price increase then we will too."

i.    Counsel for the Cooperating Party provided the Bureau with a price increase letter from the Cooperating Party dated July 29, 2005. The

Cooperating Party announced a price increase on average of 5.2% on its chocolate portfolio, effective October 31, 2005. The price increase for the Cooperating Party was such as to align its prices on a number of common formats with those of Nestlé [Canada Inc.].

j.     Counsel for the Cooperating Party provided the Bureau with a Hershey [Canada Inc.] price increase letter dated August 23, 2005 that was located in the files of Cooperating Party. Hershey [Canada Inc.] announced a price increase of an unknown percentage on most chocolate and candy products effective October 31, 2005.

k.     Counsel for the Cooperating Party provided the Bureau with a Mars [Canada Inc.] price increase letter dated September 6, 2005. Mars [Canada Inc.] announced a price increase on average of 6% on select items in its confectionery portfolio, effective November 7, 2005.

l.     Counsel for the Cooperating Party stated that Cooperating Individual 3 was contacted by Nestlé [Canada Inc.] employee Lynn Hashinsky in late fall 2005 regarding pricing at a key account. Cooperating Individual 3 reported this to the Cooperating Party's in-house counsel who in turn informed Cooperating Individual 1 of the incident.

m.     Counsel for the Cooperating Party provided the Bureau with a copy of an email exchange between Leonidas and Cooperating Individual 1 beginning on January 18, 2006. Cooperating Individual 1 congratulated Leonidas on his promotion to President and CEO of Nestlé [Canada Inc.] Leonidas responded on January 19, 2006: "Thanks [first name of Cooperating Individual 1], still want to see you Feb 7th 8 am to TALK."

n.     Counsel for the Cooperating Party provided the Bureau with a copy of an entry from Cooperating Individual 1's calendar dated February 15, 2006 showing a meeting scheduled for 7:30 am with Leonidas at a Second Cup coffee shop. Cooperating Individual 1 met Leonidas in February 2006 at a Second Cup coffee shop in Toronto. During this meeting they discussed the price of seasonal chocolate. Leonidas said he wanted Cooperating Individual 1 to take a price increase. Cooperating Individual 1 states that he refused to commit to taking a price increase. On October 30, 2006, the Cooperating Party announced a price increase on seasonal chocolate to take effect February 5, 2007 – 5% for Halloween products and 4% for Easter products.

o.     Cooperating Individual 1 received a phone call from the new President of Nestlé Confectionery, Sandra Martinez de Arevalo, in mid 2007. Martinez wanted to meet and talk. Cooperating Individual 1 and Martinez met for lunch at Auberge du Pommier on July 4, 2007 in Toronto. The discussion covered a number of issues, both personal and professional. Martinez suggested that the Cooperating Party lead a price increase in 2007, as

Nestlé wanted to take a price increase in the third quarter. Cooperating Individual 1 replied that he was not prepared to take a price increase in 2007, but indicated that the Cooperating Party might take one in 2008. Cooperating Individual 1 said he would follow on chocolate but not lead. Martinez said she would call him back in two weeks. Cooperating Individual 1 said that he was of the view that the discussion did not mater because he was leaving the Cooperating Party; he could lead her down the garden path because he would not be making the decisions. Martinez could "say whatever she wants and hear whatever she wants" because Cooperating Individual 1 would not be making pricing decisions. Cooperating Individual 1 also states that Martinez would have understood that "they were on the same page." Counsel for the Cooperating Party provided the Bureau with a copy of the receipt and expense report for the lunch on July 4, 2007.

p.      Cooperating Individual 5 received a call from Nestlé [Canada Inc.] employee Steve Morris on July 5, 2007. Morris told Cooperating Individual 5 that Nestlé [Canada Inc] was thinking about taking a price increase in early March 2008. Cooperating Individual 5 said that the Cooperating Party was thinking of taking a price increase too. They also discussed that if Nestlé [Canada Inc.] and the Cooperating Party took a price increase, Mars would probably follow too. Cooperating Individual 5 provided this information to his supervisor, Cooperating Individual 6, Cooperating Individual 7 and Cooperating Individual 8. Cooperating Individual 8 informed in-house counsel of the Cooperating Party, who in turn informed Cooperating Individual 1.

q.      Martinez left a voice mail for Cooperating Individual 1 on August 30, 2007, stating that she wanted to say goodbye before he left the Cooperating Party and requested a meeting with him the week of September 11 to 14. Cooperating Individual 1 believes that Martinez wanted to meet to follow up on the pricing discussions that took place on July 4, 2007. This meeting never occurred due to scheduling issues. Counsel for the Cooperating Party provided the Bureau with a transcribed copy of the voice-mail that was sent by Martinez to Cooperating Individual 1 on August 30, 2007.

r.      Counsel for the Cooperating Party informed Andrew Burke that on September 19, 2007, both Cooperating Individual 1 and Leonidas were in Vancouver attending an event hosted by Overwaitea, a mutual customer. Cooperating Individual 1 said that during this event, Leonidas encouraged Cooperating Individual 1 to attend an upcoming meeting of the FCPC [Food & Consumer Products of Canada]. Leonidas said that it was "public news" that Nestlé [Canada Inc.] was taking a price increase in February 2008 of 4-6% on everything and that they had told their customers. Cooperating Individual 1 did not reply and Leonidas said to him words to

the effect of "You don't need to say anything." Leonidas also encouraged Cooperating Individual 1 to contact Martinez.

s.     In emails dated November 7, 2005, February 27, 2006 and February 6, 2007, Cooperating Individual 4 refers to discussions with Martin Lebel, an employee of Effem (now Mars Canada Inc.). In the November 7, 2005 email, Cooperating Individual 4 referred to a discussion with Lebel related to Mars [Canada Inc.]'s "dead net cost" on chocolate singles and trade spend issues. In the February 27, 2006 email, Cooperating Individual 4 referred to a discussion with Lebel about the level of margins on certain chocolate products. In the February 6, 2007 email, Cooperating Individual 4 referred to a discussion with Lebel indicating that Cooperating Individual 4 obtained information from Effem and Hershey [Canada Inc.] about presentations made to one of their common customers.

t.     Counsel for the Cooperating Party provided the Bureau with a copy of an email sent on January 3, 2007 by Bert Alfonso, now Senior Vice President and Chief Financial Officer of The Hershey Company in the USA, to both Lent and Cooperating Individual 1. The email included the following statement: "As we discussed, Hershey has recently appointed Eric Lent as VP/GM for the Canada business. In keeping with the good advice from 'The Godfather,' keep close to your competition, I am including contact info below in an effort to introduce you both. All kidding aside, I know Eric is looking forward to meeting you." Subsequent email communications between Lent and Cooperating Individual 1 on January 3, 2007 set up a phone call between the two for 3:30 on January 4, 2007.

u.     Counsel for the Cooperating Party provided the Bureau with a copy of an email sent on March 15, 2007 by Lent to Cooperating Individual 1 with the subject heading "Interesting times" and the text, "I'm back in town the week after next. Let's get together!"

v.     Cooperating Individual 9 first met Lent at a dinner hosted by the FCPC trade association at Niagara-on-the-Lake on September 27, 2007.  As he was getting ready to sit down at a dinner table, Cooperating Individual 9 was approached by Lent. Lent said words to the following effect to Cooperating Individual 9: "Hey [Cooperating Individual 9], welcome back to Canada. Congratulations on your new job. Hey, by the way, Nestlé is taking a price increase." Lent continued with either "So we should take advantage" or "we should increase our prices too." Cooperating Individual 9 replied either "We should not be having this conversation" or "I am not comfortable having this conversation." Lent continued: "Don't worry we can talk about it.  Bob and I talk all the time [Lent pointed to an individual that Cooperating Individual 9 later identified as Bob Leonidas, President of Nestlé [Canada Inc.]. It's public knowledge that Nestlé [Canada Inc.] is taking its prices up." Cooperating Individual 9 contacted a member of the

Cooperating Party's in-house counsel after the dinner and left a message detailing the conversation.

w. Cooperating Individual 9 received a message from Lent on October 17, 2007 requesting a meeting. That same day, Cooperating Individual 9 sent an email reply to his assistant, and also the assistant general counsel for the Cooperating Party, adding the comment "our friend at Hershey [Canada Inc.] seems to need a reminder re: Competition Act." On October 19, 2007, counsel for the Cooperating Party brought this issue to the Bureau's attention in light of its obligations under the Immunity Program.

57. In the November 28, 2007 Information, the Competition Bureau stated, among other things, the following:

a. Hershey [Canada Inc.], ITWAL, Mars [Canada Inc.], Nestlé [Canada Inc.] and other persons known and unknown, during the period commencing at least as early as February 2002, and continuing until the present, the exact dates being unknown, did conspire, combine, agree or arrange with each other and with the Cooperating Party to enhance unreasonably the price, and to unduly prevent or lessen competition in the supply, of chocolate confectionery products in Canada, and did thereby commit an indictable offense contrary to paragraphs 45(1)(b) and (c) of the Competition Act, RSC 1985, c C-34.

b. ITWAL, while engaged in the supplying of chocolate confectionery products, during the period commencing as early as February 2002, and continuing until at least February 2004, the exact dates being unknown, did by agreement, threat, promise or like means, attempt to influence upward, or to discourage the reduction of, the price at which Cadbury [Adams Canada Inc.], Hershey [Canada Inc.], Mars [Canada Inc.] and Nestlé [Canada Inc.] supplied or offered to supply or advertised chocolate confectionery products within Canada, and did thereby commit an 23 indictable offense contrary to paragraph 61(1)(a) of the Competition Act, RSC 1985, c C-34.

c. ITWAL during the period commencing as early as February 2002, and continuing until at least February 2004, the exact dates being unknown, did by threat, promise, or like means, attempt to induce suppliers, namely Cadbury [Adams Canada Inc.], Hershey [Canada Inc.], Mars [Canada Inc.] and Nestlé [Canada Inc.], as a condition of ITWAL doing business with the suppliers, refuse to supply chocolate confectionery products to a particular person or class of persons because of the low pricing policy of that person or class of persons, and did thereby commit an indictable offense contrary to subsection 61(6) of the Competition Act, RSC 1985, c C-34.

d. The alleged conspiracy arises from communications between employees of the Cooperating Party, Hershey [Canada Inc.], Mars [Canada Inc.] and Nestlé [Canada Inc.], ITWAL and others known and unknown, who exchanged confidential pricing information. The information reveals a pattern of communications via email, telephone, private meetings and meetings on the margins of industry association conferences, from at least February 2002 to the present. The relevant industry associations are the Confectionery Manufacturers Association of Canada ("CMAC") and the Food and Consumer Products of Canada ("FCPC"). Information obtained by the Commissioner provides reason to believe that the above mentioned parties entered an agreement or arrangement to fix prices and control discounts relating to the supply of chocolate confectionery products in Canada contrary to paragraphs 45(1)(b) and 45(1)(c) of the Act, and that ITWAL has engaged in price maintenance contrary to section 61 of the Act. The Commissioner has been aware of the matter after a participant in these alleged offenses (the "Cooperating Party") approached the Bureau under its Immunity Program.

e. There was a course of communications, both direct and indirect, about trade spend for chocolate confectionery products between ITWAL, Cadbury [Adams Canada Inc.], Hershey [Canada Inc.], Mars [Canada Inc.], Nestlé [Canada Inc.] and others commencing at least as early as February 2002 and continuing until at least October 2003.  It is the Bureau's opinion that this course of communications was for the purpose of eliminating, controlling or reducing trade spend in the chocolate confectionery industry.

f. The filing cabinet in the office of Elizabeth Cloran, assistant to Ross Robertson, the Vice President and General Manager, and Glenn Stevens, the President and CEO of ITWAL, contained letters dated February 21, 2002 from Stevens addressed to each of Bob Leonidas (Nestlé [Canada Inc.]), Rick Meyers (Hershey [Canada Inc.]), Don Robinson (Mars 24 [Canada Inc.]), and Arthur Soler (Cadbury [Adams Canada Inc.]). The letters are substantively the same and the following statement is taken from the letter to Nestlé [Canada Inc.]: "At the 'end of the day,' it is only the suppliers' control and discipline of trade spending that can restore the functionality of the marketplace. The problem is very serious and completely out of control on the part of the suppliers. I am being forced to reexamine how we operate in the market and I am not sure it would be in the best interests of Nestlé. I urge you to meet and take action before this chocolate bar 'bubble bursts.'"

g. A folder labeled "TAN [Take Action Now] notices" was found in a filing cabinet in the office of Ms. Cloran and contained a number of letters from ITWAL addressed to various persons including employees of Cadbury [Adams Canada Inc.], Hershey [Canada Inc.], Mars [Canada Inc.] and Nestlé [Canada Inc.].

h.    The TAN notices folder contained a "TAN Information Bulletin" dated March 7, 2002. Accompanying the TAN Information Bulletin was a fax cover sheet to each of Bob Leonidas (Nestlé [Canada Inc.]), Rick Meyers (Hershey [Canada Inc.]), Don Robinson (Mars [Canada Inc.]), and Arthur Soler (Cadbury [Adams Canada Inc.]). The faxes were all in substantively similar terms. The fax to Cadbury [Adams Canada Inc.] contains the following statement: "Further to my letter of February 21, 2002, please find attached information forwarded by Members on product and pricing available from diverters. In view of the seriousness of the problem, I will forward information as received under the acronym, T.A.N., which stands for 'TAKE ACTION NOW!' I trust you will accept the information in the spirit with which it is intended. I look forward to meeting with you to learn what steps Cadbury is taking to address this problem." D. Glenn Stevens

i.    The TAN notices folder contained a "TAN Information Bulletin #4" dated April 5, 2002 containing the following statement: "Although I don't want to overreact too soon, it appears your efforts to 'dry up' this activity may be starting to work! . . . I want to take this opportunity to thank each of you for responding to our TAN initiative. It is very positive and encouraging already. That being the case, I want to share with you some of the information that has been discussed and the commitments given. 1. Potential gray marketers have been identified and, in some cases, cut off. Others have had their volumes reviewed and capped or monitored in the situations where buying through a distributor. . . . 2. We feel that part of the solution is that vending customers should not be sold direct and our recommended 'floor price model' will resolve it. 3. I am pleased to hear from you that in some cases, an ongoing internal audit procedure has been set up to monitor account activities with respect to purchases and movement – some of you have hired a third party investigator with results already being achieved. 4. . . . Thank you for your agreement to review. Clean up this and it allows you to clean up the allowances on street dealing through the full-service wholesalers. 5. I also want to thank you for putting in writing your serious concerns about this entire situation and the fact that your representatives are subject to immediate termination if trade spending policies are not adhered to accordingly. Together we can correct this destabilizing, dysfunctional and unprofitable practice. Let's get it done. T.A.N." Bulletin #4 was accompanied by fax cover sheets dated April 5, 2002 to each of Soler, Robinson, Meyers, Leonidas, Tim Mason (Cadbury [Adams Canada Inc.]), Roy Benin (Mars [Canada Inc.]), Ross Robertson [Hershey Canada Inc.], and Matt Hall (Nestlé [Canada Inc.]).

j.    The TAN notices folder contained a "Bulletin #15" dated December 12, 2002 containing the following statement: "To Whom it May Concern, First of all, I would like to extend congratulations to you all as we wind up the year with respect to your concerted and committed efforts to clean up

the dysfunctional retail trade spending. Your efforts can clearly be seen in the following areas: 1) Significantly less diversion of bars re: back door at retail grocery, dollar stores, vending; 2) Reduced unreasonably low retail prices, i.e. 2/99¢ or 3/99¢ (Although I ask you to remain vigilant – see attached 2/99¢ on Kit Kat and Caramilk at Maxi recently). In talking to each of you, I understand that there is a renewed effort to invest in brands and restore the profitability of this category. This is good news and we share your enthusiasm. Functional trade spending criteria combined with top management discipline, oversight and measurement can achieve this objective in 2003. We are proud as full service distributors to be your partner in this endeavor and look forward to winning together! In closing, we wish everyone a Happy Holiday Season and a fantastic prosperous New Year! T.A.N." Bulletin #15 was accompanied by fax cover sheets dated April 5, 2002 to each of Robinson, Meyers, Leonidas, Mason, Benin, Robertson, Hall, Peter Allen (Cadbury [Adams Canada Inc.]), Doug Tyler (Cadbury [Adams Canada Inc.]), David Jones (Mars [Canada Inc.]), Kurt Hatherly (Mars [Canada Inc.]), Marc Morneau [(Hershey) Canada Inc.], Todd Hoffman (Nestlé [Canada Inc.]) and Al Kehoe (Nestlé [Canada Inc.]).

k.   The TAN notices folder contained a "Bulletin #19" dated April 25, 2003, containing the following statement: "We have had considerable discussion on the disfunctionality of 2/99¢ pricing on single bars. Although good progress has been made, please find attached a store outlet and pictures of current such activity at Dollarama. The product in the pictures is fresh, having been shipped and produced in 2003. With a price increase just having been implemented, this situation becomes even more incredible. Please Take Action Now! D.G. Stevens TAN." Bulletin #19 was accompanied by fax cover sheets dated April 24, 2003 from Glenn Stevens to: David Sculthorpe (Adams) [now part of Cadbury Adams Canada Inc.], Yves Dalcourt (Mars [Canada Inc.]), Robinson, Bruce Brown (Hershey [Canada Inc.]), Leonidas, Benin, Robertson, Hall, Mike Vissers (Hershey [Canada Inc.]), Hoffman, Lance Berrisford (Cadbury [Adams Canada Inc.]), Doug Ross (Cadbury [Adams Canada Inc.]), Shawn Allen (Hershey [Canada Inc.]), Kehoe, and David Jones (Mars [Canada Inc.]).

l.   The TAN notices folder contained a set of letters from Camille Nadeau of ITWAL dated October 7, 2003 in substantively the same terms. The letters were addressed to sales staff of the particular companies and requested the presence of persons in leadership positions at an upcoming meeting. Those named in the letters were Dalcourt, Jones, Robinson, Sculthorpe, Berrisford, Hall, Leonidas, Kehoe, Brown, Robertson, and Vissers. The letter from Nadeau to Mars reads: "Yves [Dalcourt] – I would like to request the presence of David Jones and Don Robinson at our upcoming October 28 business review. The reason for their presence would be to discuss the inequity in the Market Place when it comes to keeping the full service distributor competitive with the club & cash & carry activity. It

would be ITWAL's position to request that in 2004, all club and cash &
carry pricing activities be discontinued. The only activities should be
around the value added performance that can be offered by your customers
and pricing is not perceived by ITWAL as one of these. Regards, Camille
Nadeau, Business Development Manager Retail, Itwal Ltd. CC: Glenn
Stevens."

m.    Covering the October 7 letters from Nadeau, there were a set of letters
dated October 9, 2003 in substantively the same terms, addressed to
persons in leadership positions at Cadbury [Adams Canada Inc.], Mars
[Canada Inc.], Nestlé [Canada Inc.] and Hershey [Canada Inc.] that read:
"Dear [particular addressee], Just a quick note to add that I hope you can
attend. Together we have to come to grips with this issue or everybody
loses! Yours truly, D. Glenn Stevens."

58.    On December 21, 2007 – less than one month after the Canadian Competition

Bureau announced its investigation – the Wall Street Journal reported in an article titled

"Chocolate Makers Face Probe Over Pricing" that the United States Department of Justice's

Antitrust Division ("DOJ") has begun an inquiry into Defendants' pricing practices for chocolate

confectionery products in the United States.  On December 20, 2007, Mars spokeswoman Alice

Nathanson said the company has been contacted by the Antitrust Division "regarding their

inquiry concerning pricing practices in the U.S. chocolate confectionery industry."  Nestlé

spokeswoman Laurie MacDonald similarly stated that "Nestlé USA is aware of a preliminary

investigation into the marketing practices in the U.S. chocolate industry."  Cadbury

spokeswoman Luisa Girotto would neither confirm nor deny whether Cadbury has been

contacted by the DOJ, and Hershey spokesman Kirk Saville declined to comment.

59.    Defendants' conspiracy was thus not limited to their conduct in Canada, but

extended as well to their pricing practices in the United States, commencing at least as early as

2002, consistently with the initial timing of collusive activity in Canada.  This conclusion is

supported by the DOJ investigation of pricing practices in this country, the fact that price

increases on chocolate confectionery products in the U.S. in 2002 represented a departure from

past pricing practices, the fact that the collusive activity in Canada was carried out with the knowledge and active participation of U.S. executives of Hershey and Mars, the fact that there is substantial import-export trade in chocolate confectionery products between the U.S. and Canada, and by the fact that the confectionery operations of Defendants in Canada and the U.S. were closely coordinated.

60.     As in Canada, where collusive activities were conducted through trade associations such as CMAC and FCPC, collusive activities in the United States were orchestrated under the auspices of the Chocolate Manufacturers Association (to which Hershey, Mars and Nestlé belonged) and the National Confectioners Association (to which Hershey, Mars, Cadbury Adams USA and Nestlé belonged).

61.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise or stabilize prices of chocolate confectionery products.

## FRAUDULENT CONCEALMENT

62.     Throughout the Relevant Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

63.     Giant Eagle did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations.  Nor could Giant Eagle have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the

nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

64.    Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning chocolate confectionery products, which they affirmatively concealed, at least in the following respects:

    a.    By meeting secretly to discuss prices, and customers and markets, of chocolate confectionery products sold in the U.S. and elsewhere;

    b.    By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

    c.    By giving false and pretextual reasons for the prices of chocolate confectionery products sold by them during the Relevant Period and by describing such pricing falsely as being the result of competitive factors rather than collusion.

65.    During the limitations period, each of the Defendants issued price increase announcements that were distributed or published to Giant Eagle, containing false and pretextual reasons for price increases for chocolate confectionery products. These price increases in fact resulted from Defendants' price-fixing conspiracy, rather than from the factors cited by Defendants.

66.    Defendants consistently ascribed their price increases to ordinary market forces and considerations, such as increased raw material costs. Giant Eagle did not have and could not have had, until shortly before commencement of this litigation, access to sufficient information to know that such explanations were false and pretextual.

67.    These false and misleading explanations for price increases lulled Giant Eagle into believing that increases were the normal result of competitive market forces rather than the product of collusive efforts. Defendants' statements about the reasons for the price increases

were designed to, and did, put Giant Eagle off guard and cause it to accept the increases without undertaking further inquiry.

68.     Giant Eagle did not know, and could not have discovered through reasonable diligence, that Defendants' explanations for these increases in prices for chocolate confectionery products were false and pretextual until shortly before this litigation was commenced.

69.     Because of such fraudulent concealment, and the fact that a price-fixing conspiracy such as this one is inherently self-concealing, Giant Eagle could not have discovered the existence of this conspiracy any earlier than its public disclosure.

70.     As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Giant Eagle's claims have been tolled.

## COUNT I
### (Violations Of § 1 Of The Sherman Act And § 4 Of The Clayton Act)
### (Against All Defendants)

71.     Giant Eagle incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

72.     Defendants and their co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of § 1 of the Sherman Act and § 4 of the Clayton Act.

73.     The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and standardized prices for chocolate confectionery products.  Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

74. Defendants' contract, combination, agreement or conspiracy with the co-conspirators occurred in or affected interstate and international commerce. Defendants' unlawful conduct was through mutual understanding or agreement between or among Defendants and their co-conspirators. These other co-conspirators either have acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

75. Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

    a.    Prices charged by Defendants and their co-conspirators to Giant Eagle for chocolate confectionery products were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

    b.    Giant Eagle had to pay more for chocolate confectionery products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

    c.    Price competition in the sale of chocolate confectionery products was restrained, suppressed and eliminated in the United States; and

    d.    As a direct and proximate result of the illegal combination, contract or conspiracy, Giant Eagle has been injured and financially damaged in its business and property, in amounts to be determined.

## COUNT II
### (Violation of the Ohio Valentine Act)
### (Against All Defendants)

76. Giant Eagle incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

77. Defendants and their co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of the Ohio Valentine Act, Ohio Rev. Code §§ 1331.01, 1331.02, 1331.04, and 1331.08.

78. As set forth in Paragraph 73 above, the contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants and

their co-conspirators in furtherance of which Defendants fixed, maintained, and standardized prices for chocolate confectionery products. Such contract, combination or conspiracy constitutes a per se violation of the Ohio Valentine Act and is, in any event, an unreasonable and unlawful restraint of trade.

79.  Defendants' contract, combination, agreement or conspiracy with the co-conspirators occurred in or affected, *inter alia*, Ohio commerce. Defendants' unlawful conduct was through mutual understanding or agreement between or among Defendants and their co-conspirators. These other co-conspirators either have acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

80.  Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

   a.  Prices charged by Defendants and their co-conspirators to Giant Eagle for chocolate confectionery products sold in Ohio were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

   b.  Giant Eagle had to pay more for chocolate confectionery products in Ohio than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

   c.  Price competition in the sale of chocolate confectionery products was restrained, suppressed and eliminated in Ohio; and

   d.  As a direct and proximate result of the illegal combination, contract or conspiracy, Giant Eagle has been injured and financially damaged in its business and property, in amounts to be determined.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Giant Eagle prays as follows:

   A.  That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a per se

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and a violation of the Ohio Valentine

Act, Ohio Rev. Code §§ 1331.01, 1331.02, 1331.04, and 1331.08;

      B.    That judgment be entered for Giant Eagle against Defendants for three

times the amount of damages sustained by Giant Eagle as allowed by law, including the Sherman

and Clayton Acts and the Ohio Valentine Act, together with the costs of this action, including

reasonable attorneys' fees;

      C.    That Giant Eagle be awarded pre-judgment and post-judgment interest at

the highest legal rate from and after the date of service of this Complaint to the extent provided

by law; and

      D.    That the Court issue a permanent injunction pursuant to Section 16 of the

Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws

and from practices which facilitate those violations.

      E.    That Giant Eagle have such other and further relief as the Court may deem

just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Giant Eagle demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  March 26, 2008

Respectfully submitted,

s/ Bernard D. Marcus

Bernard D. Marcus
 PA ID No.01293
 marcus@marcus-shapira.com
Scott D. Livingston
 PA ID No. 60649
 livingston@marcus-shapira.com
Moira Cain-Mannix
 PA ID No. 81131
 mcm@marcus-shapira.com
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA  15219
(412) 471-3490